UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KEYSTONE MANUFACTURING CO., INC.,

                    Plaintiff,

         v.                                              **DECISION AND ORDER**
                                                         03-CV-648S

JACCARD CORP. and ERIC J. WANGLER,

                    Defendants.

## I. INTRODUCTION

In this intellectual property action, Plaintiff Keystone Manufacturing Co., Inc. alleges

that Defendants Jaccard Corp. ("Jaccard") and Eric J. Wangler have engaged in false

marking and unfair competition with respect to their sale of the JACCARD® hand-held

meat tenderizer.   Plaintiff also seeks a declaratory judgment that the design of the

JACCARD® tenderizer is not protected trade dress.   In return, Defendants counterclaim

that Plaintiff has engaged in unfair competition and has violated their trade dress and

trademark rights in connection with its sale of the Deni® hand-held meat tenderizer.


Currently before this Court are four motions: (1) Plaintiff's Motion for Partial

Summary Judgment,[1] (2) Defendants' Motion for Partial Summary Judgment on certain of

its Counterclaims,[2] (3) Defendants' Motion for Partial Summary Judgment on certain of

---

[1]In support of this motion, Plaintiff filed a Rule 56 Statement of Undisputed Facts, a memorandum
of law, the Declaration of Peter K. Sommer, Esq., with attached exhibits, a reply memorandum of law, and
the Reply Declaration of Peter K. Sommer, Esq., with attached exhibits.  In opposition, Defendants filed a
memorandum of law, the Declaration of A. Nicholas Falkides, Esq., with attached exhibits, and the
Declaration of Eric J. Wangler.

[2]In support of this motion, Defendants filed a memorandum of law, a Rule 56 Statement of
Undisputed Facts, the Declaration of Eric Wangler, with attached exhibits, the Declaration of A. Nicholas
Falkides, Esq., with attached exhibits, and a reply memorandum of law, with attached exhibits.  In

1

Plaintiff's Causes of Action,[3] and (4) Defendants' Motion to Disqualify Plaintiff's Expert Witness.[4]  For the following reasons, the motions are granted in part and denied in part.

## II. BACKGROUND

### A.    Facts

Keystone is in the business of selling kitchen utensils and appliances, such as meat tenderizers, vacuum sealers, pizza ovens, ice cream makers, indoor grills, and other kitchen accessories.  (Plaintiff's Statement,[5] ¶ 1.)  These items are manufactured for Keystone by other companies, but sold under the Deni® name, which is a trademark owned by and registered to Keystone.  (Plaintiff's Statement, ¶ 1.)

For approximately twenty years, Keystone was a non-exclusive distributor of JACCARD® hand-held meat tenderizers.  (Plaintiff's Statement, ¶ 2.)  During that time, Andre Jaccard owned the rights to the JACCARD® tenderizers.  (Plaintiff's Statement, ¶ 2.) Mr. Jaccard obtained two U.S. utility patents and two U.S. design patents for the meat tenderizer. (Defendants' Statement,[6] ¶ 3.) In addition, Mr. Jaccard obtained utility patents

---

opposition, Plaintiff filed a memorandum of law and the Declaration of Peter Sommer, Esq., with attached exhibits.

[3]In support of this motion, Defendants filed a memorandum of law, a Rule 56 Statement of Undisputed Facts, the Declaration of Eric Wangler, with attached exhibits, the Declaration of A. Nicholas Falkides, Esq., with attached exhibits, and a reply memorandum of law, with attached exhibits.  In opposition, Plaintiff filed a memorandum of law and the Declaration of Peter Sommer, Esq., with attached exhibits.

[4]In support of this motion, Defendants filed a memorandum of law, the Declaration of A. Nicholas Falkides, with attached exhibits, and a reply memorandum of law.  In opposition, Plaintiff filed a memorandum of law and the Declaration of Leonard A. Deni, with attached exhibits.

[5]Referring to Plaintiff's Rule 56 Statement of Undisputed Material Facts filed in support of Plaintiff's Motion for Partial Summary Judgment.

[6]Referring to Defendants' Rule 56 Statement of Undisputed Material Facts filed in support of their Motions for Partial Summary Judgment.

on the product in Canada, Europe and Hong Kong.  (Defendants' Statement, ¶ 3.)  He also obtained design patents in the United Kingdom, Taiwan and China.  (Defendants' Statement, ¶ 3.)

In or about June of 2001, Eric Wangler formed the Jaccard Corporation, and acquired the assets of the company owned by Andre Jaccard.  (Wangler Decl.,[7] ¶ 4; Defendants' Statement, ¶ 4.)  Jaccard continued to sell the JACCARD® meat tenderizer, which has been marketed continuously in its present form, both domestically and internationally, since 1980. (Defendants' Statement, ¶¶ 10, 11.)

In November of 2002, Jaccard increased the price at which it was willing to sell Keystone the JACCARD® hand-held meat tenderizer.  (Wangler Decl., ¶ 5.)  Because Keystone anticipated a loss in profits upon its resale of the JACCARD® tenderizers, it began investigating whether it could manufacture and sell its own line of meat tenderizers under its Deni® trademark.  (Plaintiff's Statement, ¶ 3.)  Upon determining that Jaccard's United States patents were either expired or about to expire, Keystone made arrangements to have a competitive line of hand-held meat tenderizers manufactured in China.  (Plaintiff's Statement, ¶ 5.)  Jaccard then terminated Keystone's non-exclusive distributorship.  (Wangler Decl., ¶ 9.)

Keystone introduced the Deni® hand-held meat tenderizer onto the market in early 2003.  (Wangler Decl., ¶ 10; Defendants' Statement, ¶ 15.)  At the same time, Keystone was also selling its remaining inventory of JACCARD® tenderizers that it had previously been selling pursuant to its non-exclusive distributorship agreement.  (Plaintiff's Decl., ¶

---

[7]Referring to the Declaration of Eric J. Wangler filed in opposition to Plaintiff's Motion for Partial Summary Judgment.

7.)  Keystone does not hold a patent on its Deni® tenderizer.  (Defendants' Statement, ¶



17.)  A side-by-side depiction of the two tenderizers is set forth below.

The Deni® tenderizer is almost identical to the JACCARD® tenderizer.  (Wangler Decl., ¶ 7; Defendants' Statement, ¶ 13.)  While there are differences in shape, color and markings, the two tenderizers are manufactured with the same number and type of parts and operate in the same manner.  (Plaintiff's Statement, ¶ 5.)

The Deni® 16-blade meat tenderizer typically sells for between $14.99 and $19.99; the same size JACCARD® tenderizer sells for between $14.99 and $24.99.  (Plaintiff's Statement, ¶ 6; Wangler Decl., ¶ 8.)  The Deni® 48-blade meat tenderizer typically sells for between $29.99 and $34.99; the same size JACCARD® tenderizer sells for between

4

$29.99 and $39.99.  (Plaintiff's Statement, ¶ 6; Wangler Decl., ¶ 8.)

Additional facts where pertinent are further set forth in the context of the individual motions discussed below.

## B.    Procedural History

On August 27, 2003, Plaintiff commenced this action by filing a Complaint in the United States District Court for the Western District of New York.  Plaintiff's Complaint asserts five causes of action.  First, Plaintiff alleges that Defendants have engaged in false marking in violation of 35 U.S.C. § 292.  (Complaint, ¶¶ 34-36.)  Second, Plaintiff alleges that Defendants violated the Lanham Act, 15 U.S.C. § 1125(a).  (Complaint, ¶¶ 37-40.) Third, Plaintiff seeks a declaratory judgment with respect to whether the Deni® hand-held meat tenderizer infringes or violates any rights held by Jaccard.  (Complaint, ¶¶ 41-43.) Fourth, Plaintiff alleges that Defendants attempted to monopolize trade or commerce in violation of 15 U.S.C. § 2.[8]  (Complaint, ¶¶ 44-45.)  Finally, Plaintiff alleges that Defendants have engaged in unfair competition practices in violation of New York law.  (Complaint, ¶¶ 46-47.)

Defendants filed their Answer to the Complaint on September 16, 2003.  Therein, Defendants assert five counterclaims.  First, they contend that Keystone has infringed on Jaccard's JACCARD® trademark in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114.  (Answer, ¶¶ 40-45.)  Second, Defendants allege that Keystone has infringed its trade dress in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[9]  (Answer, ¶¶

---

[8]This cause of action has been dismissed by stipulation of the parties.

[9]Keystone argues that Jaccard has not asserted a counterclaim for trade dress infringement. While Jaccard's second counterclaim could have been better pled, this Court finds that it encompasses a claim for trade dress infringement under the Lanham Act.

46-54.)  Third, Defendants allege that Keystone has diluted the Jaccard name in violation of the Lanham Act.  (Answer, ¶¶ 55-65.)  Fourth, Defendants assert that Keystone has infringed its trademark rights in violation of New York common law.  (Answer, ¶¶ 66-73.) Finally, Defendants allege that Keystone has engaged in unfair competition in violation of New York law.  (Answer, ¶¶ 74-81.)

On November 3, 2004, Keystone filed a Motion for Partial Summary Judgment.  On December 1, 2004, Defendants filed a Motion for Partial Summary Judgment on their first, second and fifth counterclaims.  Also on that date, Defendants filed a second Motion for Partial Summary Judgment on Keystone's first, second and fifth causes of action.  On January 7, 2005, Defendants filed a Motion to Disqualify Plaintiff's Expert Witness.  This Court held oral argument on each of the above motions on June 28, 2005, and took the matter under advisement at that time.

## III. DISCUSSION

### A.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Summary Judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party." Yurman Design, Inc. v. Golden Treasure Imps., Inc., 275 F.Supp.2d 506, 508 (S.D.N.Y. 2003).

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'Ship, 22 F.3d 1219, 1224 (2d Cir. 1994). In other words, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## B.    Plaintiff's Motion for Partial Summary Judgment

Keystone moves for partial summary judgment on its third cause of action, which seeks a declaratory judgment with respect to whether the Deni® hand-held meat tenderizer violates any rights held by Jaccard. (Complaint, ¶¶ 41-43.) In particular, Keystone seeks a declaratory judgment that (1) its Deni® hand-held meat tenderizers do not infringe any U.S. patent right held by Jaccard, (2) it is legally entitled to practice the teaching of Jaccard's expired U.S. patents, and (3) its Deni® hand-held meat tenderizers do not

infringe any of Jaccard's alleged trade dress rights.  Defendants oppose the motion.

As to Keystone's first request, it is undisputed that the relevant patents in this case have expired.  (Answer, ¶¶ 5, 23; Defendants' Statement, ¶ 6.)  Two of the patents are utility patents – 4,199,841 and 4,463,476.  The other two patents are design patents – D-276,583 and D-276,685.   Because these patents have expired, there can be no infringement.  See Kearns v. Chrysler Corp., 32 F.3d 1541, 1550 (Fed. Cir. 1994) ("Because the rights flowing from a patent exist only for the term of the patent, there can be no infringement once the patent expires.").  It is axiomatic then, that the Deni® meat tenderizer does not infringe any of these four expired patents.

Keystone's second request is related to its third in the sense that they both implicate Jaccard's claim (which will be discussed at length below) that the design of its JACCARD® meat tenderizer is protected as trade dress.   In this context, the answer to whether Keystone can practice the teachings of the expired patents is clear: Keystone may practice and copy the functional teachings of the expired patents, but only to the extent that its use does not infringe other intellectual property rights that Jaccard may possess or create customer confusion in violation of Jaccard's rights under the Lanham Act.  This is because the Lanham Act provides protection for trade dress only when it is non-functional.  See 15 U.S.C. § 1125(a)(3).  If aspects of the JACCARD® tenderizer design are determined to be non-functional and therefore entitled to intellectual property protection (e.g., trade dress), then Keystone cannot freely use and copy Jaccard's design.  Because resolution of Keystone's first and second requests for declaratory judgment simply requires the restatement of settled law, this Court finds no cause to grant a declaratory judgment to this effect.

8

Keystone's third request raises an interesting question. Keystone wants a declaratory judgment that its Deni® tenderizer does not infringe any of Jaccard's trade dress rights. Actually, Keystone's position is that Jaccard has no trade dress rights. Relying primarily on the patent clause and cases interpreting it, Keystone argues that the JACCARD® tenderizer is not entitled to trade dress protection because it was previously protected by a utility patent.

The patent clause of the United States Constitution provides that Congress shall have the power "[t]o promote the Progress of Science and useful Arts, by securing *for limited Times* to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8 (emphasis added). Keystone argues that because the terms of Jaccard's patents have expired, it is free to copy the design of the JACCARD® tenderizer at will. It argues that the patent clause, notwithstanding substantive trade dress principles, precludes a patentee from claiming trade dress protection in that which had been claimed in an expired patent. Cf. Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 164-65, 109 S.Ct. 971, 985, 103 L.Ed.2d 118 (1989) ("For almost 100 years, it has been well established that in the case of an expired patent, the federal patent laws do create a federal right to copy and to use.").

The issue of whether the patent clause precludes trade dress protection at the expiration of the patent term was raised, but not decided, in TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d (2001). In TrafFix, the Supreme Court was tasked with determining "the effect of an expired patent on a claim of trade dress infringement." 532 U.S. at 29. The Court determined that a prior patent has "vital significance" in resolving a trade dress claim, and that a utility patent is "strong evidence

9

that the features therein claimed are functional." Id. In doing so, the Court noted that "[w]here the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." Id. at 30.

What the Court recognized, but did not resolve, is the argument that Keystone advances here. The Court indicated that several *amici* argued that the patent clause itself prohibits the holder of an expired utility patent from claiming trade dress protection. See id. at 35. In response, the Court stated that "[i]f, despite the rule that functional features may not be the subject of trade dress protection, a case arises in which trade dress becomes the practical equivalent of an expired utility patent, that will be time enough to consider the matter." Id. Thus, the Supreme Court has not resolved this issue.

This Court interprets the current state of the law as foreclosing Keystone's third request for declaratory judgment. Under TrafFix, the existence of an expired utility patent is strong evidence of functionality, but it does not bar the application of trade dress protection to portions of the covered design determined to be non-functional. The Court specifically left open the possibility that "where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims, such as arbitrary curves in the legs or an ornamental pattern painted on the springs, a different result might obtain. There the manufacturer could perhaps prove that those aspects do

not serve a purpose within the terms of the utility patent."[10] Id. at 34.

That is the case here. Jaccard argues that the design of its tenderizer, whether claimed in a prior utility patent or not, is non-functional, arbitrary or ornamental. While it may have to carry a heavy evidentiary burden at trial, this Court finds that trade dress protection for the JACCARD® tenderizer is not totally foreclosed. Based on the current state of the relevant authority, this Court cannot conclude as a matter of law that the design of the JACCARD® tenderizer is not entitled to trade dress protection simply because it may have been previously protected by a utility patent. Consequently, Keystone's third request for declaratory judgment will be denied.

## C.    Defendants' Motion for Partial Summary Judgment on its Counterclaims

Jaccard has moved for summary judgment on its first, second and fifth counterclaims. Jaccard's first counterclaim is for trademark infringement under the Lanham Act. Its second counterclaim is for trade dress infringement under the Lanham Act. Its fifth counterclaim is for unfair competition under New York law. So as not to interrupt the trade dress discussion, this Court will discuss Jaccard's second counterclaim first, and then analyze its first and fifth counterclaims.

---

[10]This Court is aware of Professor McCarthy's criticism of this statement. Professor McCarthy characterizes Justice Kennedy's observation as "perplexing" and surmises that Justice Kennedy has confused patent claims with patent disclosures. See J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition 7:89 (4th ed. 2005). In Professor McCarthy's view, "non-functional elements should not appear and do not appear in patent *claims*." Id. (emphasis in original). Therefore, the claims of a utility patent would never contain non-functional aspects such as "arbitrary curves" or "ornamental patterns," thereby eliminating the possibility that a litigant could ever prove that a design feature claimed in a utility patent is non-functional. Despite these criticisms, TrafFix is the current state of the law, and this Court must follow this precedent until the Court modifies its statement in TrafFix or otherwise provides further guidance.

1.      **Trade Dress Infringement under the Lanham Act**

Jaccard asserts a counterclaim against Keystone for trade dress infringement pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Jaccard contends that the design of its JACCARD® meat tenderizer is protected trade dress, and that Keystone has violated its rights by selling the "knock-off" Deni® tenderizer.  Keystone argues that the design of the JACCARD® meat tenderizer is not entitled to trade dress protection because it is non-distinct and functional, as evidenced by its disclosure in the expired patents, particularly in Claim 15 of the '476 utility patent.

"The Lanham Act gives a seller or producer the exclusive right to "register" a trademark, . . . and to prevent his or her competitors from using that trademark . . . ." Qualitex Co. v. Jacobson Prods. Co., Inc., 514 U.S. 159, 162, 115 S.Ct. 1300, 1302, 131 L.Ed.2d 248 (1995).  This protection extends not only to word marks, but also to the design of a product as a form of trade dress.  See Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209, 120 S.Ct. 1339, 1342, 146 L.Ed.2d 182 (2000) (§ 43(a) of the Lanham Act "embrace[s] not just word marks . . . but also 'trade dress' . . . [which] encompass[es] the design of a product").  "Trade dress is the 'overall composition and design [of a product], including size, shape, color, texture, and graphics.'" Waddington N. Am. Bus. Trust v. EMI Plastics, Inc., 02-CV-3781, 2002 WL 2031372, at *2 (E.D.N.Y. Sept. 5, 2002) (quoting Coach Leatherware Co., Inc. v. AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir. 1991)); see also Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 114 (2d Cir. 2001) (trade dress includes "the design or configuration of the product itself"); Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 999 (2d Cir. 1997)("The concept of trade dress encompasses the design and appearance of the product together with all the elements

12

making up the overall image that serves to identify the product presented to the consumer.").

> It is well established that trade dress can be protected under federal law. The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods. In these respects protection for trade dress exists to promote competition.

TrafFix, 532 U.S. at 28.

The party claiming trade dress infringement must establish (1) that its trade dress is distinctive as to the source of the product, (2) that the defendant's product dress creates a likelihood of customer confusion, and (3) that its trade dress is not functional. See Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 377 (2d Cir. 1997); Fibermark, Inc. v. Brownville Specialty Paper Prods., Inc., No. 7:02-CV-0517, 2005 WL 1173562, at *3 (N.D.N.Y. May 11, 2005); Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co., 292 F.Supp.2d 535, 541 (S.D.N.Y. 2003); Yurman Design, 275 F.Supp.2d at 510; 15 U.S.C. § 1125(a).

Generally, "[t]o be entitled to protection under the [Lanham] Act, plaintiff's trade dress must either be inherently distinctive or be shown to have acquired distinctiveness through 'secondary meaning.'" Landscape Forms, 113 F.3d at 377 (quoting Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 774, 112 S.Ct. 2753, 2759-60, 120 L.Ed.2d 615 (1992)). "In either case, it is the ability of the trade dress to designate a product source that is decisive." New Colt Holding Corp. v. RJG Holdings of Fla., Inc., 312 F.Supp.2d 195, 206 (D.Conn. 2004). However, for product design cases, the Supreme Court has stated

that "a product's design is distinctive, and therefore protectible, *only* upon a showing of secondary meaning." Samara Bros., 529 U.S. at 216 (emphasis added). Therefore, because Jaccard seeks protection for its product design, it must establish secondary meaning. See id.; Abercrombie & Fitch, 292 F.Supp.2d at 541 ("In product design cases such as this one, however, the Supreme Court has held that the plaintiff must always make the more difficult showing of 'acquired distinctiveness.'" (quoting Samara Bros., 529 U.S. at 216)).

The distinctiveness requirement also incorporates the related doctrines of genericness, specificity and consistency. See Abercrombie & Fitch, 292 F.Supp.2d at 541. "A trade dress which is either generic, non-specific, or inconsistent among its products cannot be distinctive." Id.; see also Yurman Design, 262 F.3d at 114-16; Jeffery Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 32-34 (2d Cir. 1995).

Assuming that secondary meaning is established, Jaccard must then show that Keystone's marketing of the Deni® tenderizer is likely to create confusion as to its source or sponsorship. See Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 118-19 (2d Cir. 2001); Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45 (2d Cir. 2000); 15 U.S.C. § 1125(a)(1)(A).

Finally, notwithstanding distinctiveness and the likelihood of customer confusion, no protection under the Lanham Act is available if the claimed trade dress is functional. Samara Bros., 529 U.S. at 216 ("It is true, of course, that the person seeking to exclude new entrants would have to establish the nonfunctionality of the design feature . . ."); see also Nora Beverages, 269 F.3d at 118 ("trade dress is protected under the Lanham Act if it is not functional and if it is either inherently distinctive or has acquired secondary

14

meaning in the marketplace"); Fibermark, 2005 WL 1173562, at *3 ("Even if Plaintiff can demonstrate that its trade dress is entitled to protection, there can be no liability if the feature is functional."); 15 U.S.C. § 1125(a)(3).  This is because "[i]t is the province of patent law, not trademark law, to encourage invention by granting investors a monopoly over new product designs or functions for a limited time . . . after which competitors are free to use the invention."  Qualitex, 514 U.S. at 164.  Therefore, designs that are functional are not entitled to trade dress protection.  See 15 U.S.C. § 1125(a)(3).

The Second Circuit Court of Appeals has warned district courts to exercise "particular caution" when extending protection to product designs.  Landscape Forms, 113 F.3d at 380 (quoting Milstein, 58 F.3d at 32).  This is because most product designs are not intended to identify the source of the product, but rather, are intended to enhance the product by making it more useful or appealing.  See Samara, 529 U.S. at 213 ("In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist.") The danger is that "granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves," which would defeat the "strong federal policy in favor of vigorously competitive markets." Landscape Forms, 113 F.3d at 379, 380.

The Court of Appeals' reluctance to freely grant trade dress protection to product designs derives from the general principle "that intellectual property owners should not be permitted to recategorize one form of intellectual property as another, thereby extending the duration of protection beyond that which Congress deemed appropriate for their actual creative efforts."  Chosun Int'l., Inc. v. Chrisha Creations, Ltd., 413 F.3d 324, 328 n. 2 (2d Cir. 2005) (citing Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 36-38,

123 S.Ct. 2041, 156 L.Ed.2d 18 (2003) and TrafFix, 532 U.S. at 29-30).

### a.    Is the Design of the Jaccard® Meat Tenderizer Distinctive?

"A Plaintiff must articulate and support its claimed trade dress with sufficient particularity." Fibermark, 2005 WL 1173562, at *5 (citing Landscape Forms, 113 F.3d at 381). Here, Jaccard specifies its trade dress as follows:

> A meat tenderizer comprised of:
>
> A light colored, glossy plastics, hand held, product including,
>
> a soft cornered, horizontally oriented, generally rectangular handle having inwardly directed surfaces on both ends and both sides leading to a pinched waist or a reduced dimension portion; and
>
> a soft cornered, horizontally oriented, generally rectangular base or cover, that mates flush with the handle, having inwardly directed surfaces on both ends leading to a reduced dimension length.

(Woodring Report,[11] ¶ 23.)

It is graphically depicted as follows:

---

[11]Referring to the report of Cooper Woodring, Jaccard's expert, dated July 22, 2004, a copy of which is attached as Exhibit C to the Declaration of Peter K. Sommer submitted in support of Plaintiff's Motion for Partial Summary Judgment.

A meat tenderizer comprised of:

A light colored, glossy plastics, hand held, meat tenderizer including,

a soft cornered,

horizontally oriented, generally rectangular handle

having inwardly directed surfaces on both ends and both sides

leading to a pinched waist or a reduced dimension portion, and

a soft cornered,

horizontally oriented, generally rectangular base or cover,

that mates flush with the handle,

having inwardly directed surfaces on both ends

leading to a reduced dimension length.



17

Keystone does not challenge the specificity of Jaccard's trade dress or argue that it is generic or inconsistent. Therefore, the question is whether Jaccard's trade dress has "acquired distinctiveness." On this issue, Keystone argues that Jaccard is unable to prove secondary meaning because its trade dress is aesthetic and does not indicate source.

Trade dress has "acquired distinctiveness" if it has developed secondary meaning. Samara, 529 U.S. at 211. Secondary meaning occurs when, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (citing Kellog Co. v. Nat'l Biscuit Co., 305 U.S. 111, 118, 59 S.Ct. 109, 115, 83 L.Ed. 73 (1938)); see also Samara, 529 U.S. at 211 n. 1 (explaining that secondary meaning, which originated as a word mark concept, has "come to refer to the acquired, source-identifying meaning of a nonword mark as well"). Jaccard will therefore have to prove that "over time, the trade dress has become identified with its producer in the minds of potential consumers." L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., 79 F.3d 258, 263 (2d Cir. 1996).

Whether trade dress has acquired secondary meaning is a question of fact. Waddington, 2002 WL 2031372, at *5. The factors to be considered, none of which is dispositive, are as follows: "(1) advertising expenditures, (2) consumer studies linking the mark to source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." Centaur Communications, Ltd. v. A/S/M Communications, Inc., 830 F.2d 1217, 1222 (2d Cir. 1987), overruled on other grounds as recognized by, Bristol-Myers Squibb Co. v. McNeill-P.P.C., Inc., 973 F.2d 1033, 1044 (2d Cir. 1992); see also Genesee Brewing Co. v. Stroh Brewing

Co., 124 F.3d 137, 143 n. 4 (2d Cir. 1997); Fibermark, 2005 WL 1173562, at *5; New Colt

Holding, 312 F.Supp.2d at 206 (noting that no single factor is determinative and every

factor need not be proven).

The record contains expert reports from both Jaccard and Keystone.  Jaccard's

expert, Cooper C. Woodring, opines in his report that the five factors listed above weigh

in favor of finding that Jaccard's claimed trade dress is distinctive.  (Woodring Report, ¶¶

27-40.)  Mr. Woodring discusses each relevant factor and supports his opinions with

exhibits attached to his report.  He concludes that the claimed trade dress is not

functional.[12]  (Woodring Report, ¶¶ 41-51.)  Jaccard also relies on advertising materials,

awards and declarations from customers attesting to the strength and distinctiveness of

the JACCARD® design.  (Wangler Decl., Exhibits C, E; Falkides Decl., Exhibits J, K, AC.)

In contrast, Keystone's expert, Leonard A. Deni,[13] opines in his report that Jaccard's

trade dress is not distinctive and does not indicate source.  (Deni Report,[14] ¶¶ 11-15).

Specifically, he states that other hand-held meat tenderizers on the market such as those

---

[12]Keystone argues that Mr. Woodring conceded in his Expert Rebuttal Report that the Jaccard design has "some function" and therefore, under Disc Golf Ass'n., Inc. v. Champion Discs, Inc., this Court must construe the design as wholly functional.  158 F.3d 1002, 1007 (9th Cir. 1998) (commenting that a product need only have some utilitarian advantage to be considered functional).  In this Court's view, Keystone's argument overstates Mr. Woodring's comments and fails to appreciate the difference between "some function" in the abstract and functionality for purposes of trade dress analysis.  The Supreme Court has explained that "a feature is functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device."  TrafFix, 532 U.S. at 33.  "A design feature of a particular article is 'essential' only if the feature is dictated by the functions to be performed; a feature that merely accommodates a useful function is not enough."  Abercrombie & Fitch, 292 F.Supp.2d at 548 (quoting Stormy Clime Ltd. v. ProGroup, Inc., 809 F.2d 971, 975 (2d Cir. 1987)).  Nowhere in Mr. Woodring's report does this Court detect an unqualified concession of functionality in line with this definition.

[13]Mr. Deni is the Vice-President of Keystone Manufacturing and is a 40% stakeholder in the company.  He is being offered as Keystone's only expert in this case.

[14]Referring to the expert report of Leonard A. Deni, dated June 30, 2004, a copy of which is attached as Exhibit D to the Declaration of Peter K. Sommer submitted in support of Plaintiff's Motion for Partial Summary Judgment.

made by "Mr. Bar-B-Que" are also virtually identical to the JACCARD® tenderizer. (Deni Report, ¶ 12.) As such, in Mr. Deni's expert opinion, the design of the JACCARD® tenderizer is not distinctive and does not indicate source.

Since a reasonable jury could credit either expert, this Court finds that there is a genuine issue of material fact regarding whether Jaccard has acquired secondary meaning in its product design. Summary judgment on this issue would therefore be improper. See Waddington, 2002 WL 2031372, at *5 (secondary meaning is a question of fact); Yurman Design, 275 F.Supp.2d at 508 ("Summary Judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.").

### b. Is There a Likelihood of Confusion Between the Jaccard® and Deni® Meat Tenderizers?

"'Likelihood of confusion exists when customers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" New Colt Holding, 312 F.Supp.2d at 220 (quoting Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1265 (9th Cir. 2001)). In determining the likelihood of confusion, courts in the Second Circuit use the familiar multi-factor balancing test articulated in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961). See, e.g., Waddington, 2002 WL 2031372, at *6 (applying the Polaroid test to determine likelihood of confusion). The Polaroid factors are non-exhaustive, and no single factor is determinative. See Plus Prods. v. Plus Disc. Foods, Inc., 722 F.2d 999, 1004 (2d Cir. 1983).

20

The eight <u>Polaroid</u> factors are as follows: (1) the strength of the mark, (2) the degree of similarity between the two marks, (3) the proximity of the products, (4) the likelihood that the prior owner will bridge the gap, (5) actual confusion, (6) the defendant's good faith in adopting its own mark, (7) the quality of defendant's product and (8) the sophistication of the buyers.  <u>See</u> <u>Polaroid</u>, 287 F.2d at 495.

Application of the <u>Polaroid</u> factors need not be rigid, but it is nevertheless "incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why."  <u>Arrow Fastener Co. v. Stanley Works</u>, 59 F.3d 384, 400 (2d Cir. 1995).  That said, a court should nevertheless hone its focus on the ultimate question of whether consumers are likely to be confused.  <u>See</u> <u>Lang v. Retirement Living Publ'g Co.</u>, 949 F.2d 576, 580 (2d Cir.1991).

### i.    Strength of the Mark

Gauging the strength of trade dress or a trademark requires examination of the inherent distinctiveness and the degree to which the mark is distinctive in the marketplace. <u>See</u> <u>Nora</u>, 269 F.3d at 123; <u>Streetwise Maps, Inc. v. Vandam, Inc.</u>, 159 F.3d 739, 743-44 (2d Cir. 1998).  As set forth above, this Court finds that material questions of fact exist as to whether the design of the JACCARD® tenderizer is sufficiently distinctive.

### ii.    The Degree of Similarity Between the Two Marks

This factor requires examination of "whether the similarity of the marks is likely to provoke confusion among potential customers."  <u>Welch Allyn Inc. v. Tyco Int'l Servs. AG</u>, 200 F.Supp.2d 130, 139 (N.D.N.Y. 2002).  On this point, there is no issue for decision. Keystone admits that the design of its Deni® meat tenderizer is virtually identical to the

21

design of the JACCARD® tenderizer.

### iii.    Proximity of the Products

This Polaroid factor "concerns whether and to what extent the two products compete with each other and the nature of the products themselves and the structure of the relevant market." Morningside Group Ltd. v. Morningside Capital Group, L.L.C., 182 F.3d 133, 140 (2d Cir. 1999) (internal quotations and citations omitted). There is no dispute that the products offered for sale by Jaccard and Keystone are directly competitive since they both sell hand-held meat tenderizers in the same market.

### iv.    Bridging the Gap

This factor requires examination of the likelihood that the two products will "bridge the gap" between markets and end up competing in the same market. However, when the plaintiff and defendant are already in the same business, such as they are here, there is no gap to bridge and this factor is therefore inapplicable. See Kadant, Inc. v. Seeley Mach., Inc., No. 02-CV-1568 (DNH/RFT), 2003 WL 354635, at *6 (N.D.N.Y. Jan. 30, 2003); Waddington, 2002 WL 2031372, at 7.

### v.    Actual Confusion

While the Lanham Act requires a showing of only a likelihood of confusion, evidence of actual confusion "is of course convincing evidence that confusion is likely to occur." Morningside Group, 182 F.2d at 141; see also Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 963-64 (2d Cir. 1996). Evidence of actual confusion may take the form of consumer survey evidence or "anecdotal evidence of confused consumers in the marketplace." Chum Ltd. v. Lisowski, No. 98 CIV 5060, 2001 WL 243541, *11 (S.D.N.Y.

Mar. 12, 2001).

Jaccard has offered evidence of actual customer confusion.  For example, there is an excerpt from a J.C. Penney Catalog featuring a photo of the JACCARD® tenderizer but describing it in the copy as the Deni® tenderizer.  (Falkides Decl., Exhibit E.)  There is also a videotape from the QVC Shopping Network wherein the Deni® tenderizer is referred to as "what used to be called the Jaccard."  (Wangler Decl., Exhibit I.)  Further, Jaccard has submitted an affidavit from an individual who ordered a Deni® tenderizer on the Internet and received a JACCARD® tenderizer in fulfillment of the order.  (Falkides Decl., Exhibit AE.)  Defendant Wangler also states that he ordered a Deni® tenderizer but was sent a JACCARD®.  (Wangler Decl., ¶ 32.)  Additional evidence is contained in the record.

Keystone does not offer any evidence on this issue.  Rather, it simply contends that the incidents of confusion identified by Jaccard were not its fault.  For example, Keystone contends that the J.C. Penney catalog confusion came as the result of an editing error by J.C. Penney.  It further argues that it had no control over the unscripted QVC segment in which its product was confused with Jaccard's.  Notwithstanding these arguments, the fact remains that Jaccard has provided evidence of actual customer confusion.

### vi.    Good Faith/Bad Faith

This factor examines whether the mark in question is adopted or used "with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."  Lang, 949 F.2d at 583; see also Nora Beverages, 269 F.3d at 124.  Of course, "the intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product."  See Streetwise Maps, 159 F.3d at 745; see also George Basch Co. v.

23

Blue Coral, Inc., 968 F.2d 1532, 1541 (2d Cir. 1992). The determination of good faith, like many other intent issues, is best left for resolution by the trier of fact. Sports Auth., 89 F.3d at 964.

Neither party has submitted evidence on this issue. Jaccard argues that Keystone acted in bad faith by deliberately and knowingly designing its product to mimic the JACCARD® tenderizer. Keystone argues that it did not act in bad faith and only copied the design because it believed it was legally entitled to do so.

### vii.    Quality of the Product

Analysis under this factor falls on two points: First, it must be determined whether the defendant's products are of an inferior quality, thus damaging the plaintiff's reputation. See Arrow Fastener, 59 F.3d at 398. Second, it must be determined whether the defendant's products are of equal quality to plaintiff's, thus creating confusion as to the source of the product because of the similarity. See Morningside Group, 182 F.3d at 142.

Here, the quality of the two products has not been thoroughly discussed, although the record contains evidence that Mr. Wangler made representations that Keystone's product was inferior. Assuming the facts in the light most favorable to Keystone, this Court assumes that the products are of similar quality. As noted above however, even products of equal quality can create customer confusion as to source.

### viii.    Sophistication of Buyers

"[T]he more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product." Bristol-Myers Squibb, 973 F.2d at 1046; see

24

also TCPIP Holding Co., Inc. v. Haar Communications, Inc., 244 F.3d 88, 102 (2d Cir. 2001) ("The more sophisticated the consumers, the less likely they are to be misled by similarity in marks."). The mere showing of sophistication alone, however, especially when there is a high degree of similarity between the parties' products or services, will not necessarily demonstrate a diminished likelihood of confusion. Morningside Group, 182 F.3d at 143.

The two products at issue are relatively inexpensive kitchen accessories. The sophistication level of customers ranges from household cooks to professional chefs. There is evidence in the record, however, that even sophisticated purchasers were confused by the design of the two products. For example, a buyer for Williams-Sonoma approached Mr. Wangler at a trade show and stated that she thought the JACCARD® tenderizer was a Deni® tenderizer. (Wangler Decl., ¶ 43.)

### ix.    Conclusion on Likelihood of Confusion

Whether there is a likelihood of confusion is a question of fact. See New Colt Holding, 312 F.Supp.2d at 220. Having reviewed the record evidence on the relevant Polaroid factors, this Court finds that there are disputed issues of material fact that preclude summary judgment. The Polaroid factors are not exhaustive and no one factor is determinative. As such, a reasonable jury could be persuaded by overwhelming evidence on one factor, consistent evidence covering each of the factors, or evidence bearing on a relevant point not included in the Polaroid framework. Here, there is at least an issue of fact as to the distinctiveness and strength of Jaccard's product design. If a jury credits Keystone's evidence and finds that other products in the marketplace are also similarly identical to the JACCARD®, it could reasonably find that the design of the Deni®

25

tenderizer is not likely to cause customer confusion. Accordingly, Jaccard's request for summary judgment on this issue will be denied.

### c.    Is the Design of the Jaccard® Meat Tenderizer Functional?

When trade dress is unregistered, as it is for purposes of this case, the party asserting trade dress protection has the burden of proving that the trade dress is not functional.[15]   15 U.S.C. § 1125(a)(1)(A); <u>New Colt Holding</u>, 312 F.Supp.2d at 203; <u>Waddington</u>, 2002 WL 2031372 at *2.   "This burden of proof gives force to the well-established rule that trade dress protection may not be claimed for product features that are functional." <u>TrafFix</u>, 532 U.S. at 29.  Whether trade dress is functional is a question of fact for the jury.  <u>See</u> <u>Fun-Damental Too</u>, 111 F.3d at 1002; <u>New Colt Holding</u>, 312 F.Supp.2d at 212; <u>Waddington</u>, 2002 WL 2031372, at *2.  Thus, any disputes of material fact will preclude summary judgment.  <u>New Colt Holding</u>, 312 F.Supp.2d at 212.

The Supreme Court has explained that "a feature is functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." <u>TrafFix</u>, 532 U.S. at 33; <u>see</u> <u>also</u> <u>Qualitex</u>, 514 U.S. at 165; <u>Inwood</u>, 456 U.S. at 850 n. 10. "A design feature of a particular article is 'essential' only if the feature is dictated by the functions to be performed; a feature that merely accommodates a useful function is not enough." <u>Abercrombie & Fitch</u>, 292 F.Supp.2d at 548 (quoting <u>Stormy Clime</u>, 809 F.2d at 975.

---

[15]Jaccard obtained a U.S. trademark registration for the design of the JACCARD® tenderizer after the institution of this litigation.  (Falkides Decl., Exhibit N.)  The description of the mark is "a pictorial representation of a meat tenderizer."  (Falkides Decl., Exhibit N.)  The record relating to the scope of this mark is insufficient for this Court to conclude that it extends to the design of Jaccard's tenderizer. Consequently, for purposes of this motion, this Court considers Jaccard's claimed trade dress to be unregistered.  This finding negates the need to discuss Keystone's claim that Jaccard obtained its design registration fraudulently.

Further inquiry is appropriate in cases involving aesthetic functionality.[16]  There, "it is proper to inquire into whether the feature is one where "the exclusive use . . . would put competitors at a significant non-reputation-related disadvantage." TrafFix, 532 U.S. at 32-33 (discussing Qualitex); Fibermark, 2005 WL 1173562, at *4.  However, "when the design is functional . . . there is no need to proceed further to consider if there is a competitive necessity feature." TrafFix, 532 U.S. at 33.  When design features are determined to be functional, it is not necessary for courts, or competitors, to speculate as to whether viable alternative designs exist.  Id. at 33-34.

Perhaps the strongest evidence of functionality is the existence of a prior utility patent on the product at issue.  Id. at 29.

> A prior patent, we conclude has vital significance in resolving the trade dress claim.  A utility patent is strong evidence that the features therein claimed are functional.  If trade dress protection is sought for those features the strong evidence of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional until proven otherwise by the party seeking trade dress protection.  Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device.

Id. at 29-30.

---

[16]Aesthetic functionality is found when aesthetic considerations play an important role in the purchasing decisions of prospective consumers.  A design feature that substantially contributes to the aesthetic appeal of a product may therefore qualify as functional.  See generally Qualitex, 514 U.S. at 170 (discussing aesthetic functionality).

In this regard, not only should the claims of the patent be analyzed, but courts are authorized to "go beyond the claims and examining the patent and its prosecution history to see if the feature in question is shown as a useful part of the invention." Id. at 34.

Unsurprisingly, the parties have opposing views on whether Jaccard's claimed trade dress is functional. Jaccard argues that the design of its tenderizer is arbitrary, and that any design of handle and blade cover would work just as well, as evidenced by other hand-held meat tenderizers on the market that are of different shapes. Its expert witness, Mr. Woodring, opines that Jaccard's trade dress is nonfunctional because it does not yield a utilitarian advantage. (Woodring Report, ¶¶ 41-42; Woodring Rebuttal Report, ¶¶ 10-36.)

Keystone's expert, Mr. Deni, opines just the opposite. He contends that the shape and configuration of the JACCARD® tenderizer are functional. (Deni Report, ¶ 14-20.) For example, he concludes that the soft cornered design prevents injury and makes the product less susceptible to being damaged. (Deni Report, ¶ 15.) He also is of the opinion that the flared design of the blade cover is functional in that it prevents the cover from coming loose. (Deni Report, ¶ 20.) In addition to Mr. Deni's opinions, Keystone also relies on its assertion that the product design was claimed in a prior utility patent.

Both sides have focused on whether Jaccard's trade dress is claimed in Claim 15 of the '476 patent. This is no doubt an important issue in this case. However, this Court finds that it is an evidentiary issue that does not require resolution at this time. First, claim construction is an issue of law that courts ordinarily decide after the benefit of a proceeding dedicated solely to claim construction called a Markman hearing. Such a proceeding has not taken place in this case. While there was extensive oral argument on June 28, 2005, it covered all four motions presently at bar; it was not dedicated to claim construction.

28

Second, as discussed above, the existence of a prior utility patent does not completely foreclose the possibility of trade dress protection. Rather, it serves as strong evidence of functionality. TrafFix, 532 U.S. at 29. Therefore, even if this Court determined that the claims of the '476 patent cover Jaccard's trade dress, issues of material fact would remain. Jaccard could still attempt to prove at trial that its claimed trade dress does not serve a functional purpose under the utility patent. See TrafFix, 532 U.S. at 30 ("[w]here the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device").

Third, if this Court determined that Jaccard's claimed trade dress falls outside of Claim 15 of the '476 patent, that does not mean that Jaccard's trade dress is nonfunctional for purposes of trade dress protection. Jaccard must still establish nonfunctionality. This is because the concept of functionality is different in each circumstance. For trade dress purposes, "a feature is functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." TrafFix, 532 U.S. at 33. Thus, the functionality inquiry involves examining the purpose and use of the meat tenderizer as a whole.

In the context of patent claim construction, particularly means-plus-function claims as are involved here, the inquiry is narrower. The court determines only the function of the disputed patent term (e.g. the handle means or blade cover means), rather than the function or purpose of the product as a whole. The court must then determine the scope of the structure that corresponds to the identified function. See Engineered Prods. Co. v.

29

Donaldson Co., Inc., No. 04-1596, 05-1002, 05-1037, 2005 WL 2090662, at *3 (Fed. Cir. Aug. 31, 2005) (in construing a means-plus-function claim limitation, the court must first identify the claimed function and then determine the structure in the specification that corresponds to that function); Gleason Works v. Oerlikon Geartec AG, 238 F.Supp.2d 504, 512 (W.D.N.Y. 2002) (same).

Consequently, this Court finds that resolution of the claim construction issue is not necessary at this point to decide Jaccard's request for summary judgment. Functionality is a question of fact. The record contains competing expert opinions on the issue of functionality, either of which the jury could credit. That alone precludes summary judgment. A Markman hearing will be scheduled in advance of trial for purposes of determining the evidentiary value under TrafFix, if any, of the '476 patent. Jaccard's Motion for Summary Judgment on this issue will be denied.

### 2.    Trademark Infringement under the Lanham Act

Jaccard asserts a counterclaim against Keystone for trademark infringement pursuant to § 32(1) of the Lanham Act, 15 U.S.C. §1114. Jaccard contends that Keystone has used its JACCARD® word mark in a confusing manner. Keystone argues that its use of the JACCARD® mark constitutes fair use because it was legitimately selling Jaccard's product.

Section 32 of the Lanham Act prohibits the use in commerce, without consent, of any "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods," in a way that is likely to cause, confusion, mistake or deception with another's registered trademark. 15 U.S.C. § 1114(1)(a); Phillip Morris USA, Inc. v. Marlboro Express, No. CV-

03-1161, 2005 WL 2076921, at *4 (E.D.N.Y. Aug. 26, 2005).  To establish liability under this section, the plaintiff must demonstrate (1) that it has a valid trademark entitled to protection, and (2) that defendant's use of its mark is likely to cause confusion.  See Arrow Fastener, 59 F.3d at 390; Nature's Best, Inc. v. Ultimate Nutrition, Inc., 323 F.Supp.2d 429, (E.D.N.Y. 2004).  As noted above, likelihood of confusion is determined in this circuit under the Polaroid factors.

Registration of a word mark with the Patent and Trademark Office is prima facie evidence that the mark is valid and therefore entitled to protection.  See 15 U.S.C. § 1067(b); Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999).  Here, it is undisputed that Jaccard's word mark – JACCARD – has been registered as a trademark since October 13, 1981.  (Falkides Decl., Exhibit M.)  Accordingly, this Court finds that there is a presumption that it is entitled to protection under the Lanham Act.

On the issue of likelihood of confusion, Keystone has not expressly contested the relevant Polaroid factors.  Instead, Keystone raises the fair use defense based on the fact that it was a prior distributor of the JACCARD® meat tenderizer and continued to sell legitimate JACCARD® meat tenderizers after its distributorship ended.  The fair use provision of the Lanham Act provides that a trademark owner's claim that it has the exclusive right to use its mark is subject to the defense "[t]hat the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party . . . ." 15 U.S.C. § 1115(b)(4).

31

Jaccard contends that Keystone has used its word mark in an infringing manner. In support of this contention, Jaccard points to the J.C. Penney and QVC incidents described above.  It also alleges that Keystone impermissibly used its word mark in its advertising materials.  (Wangler Decl., Exhibits L, N.)  However, issues of material fact exist as to the extent of Keystone's actual involvement in the J.C. Penney and QVC incidents.  Keystone denies involvement outright.[17]  Issues also exist as to whether Keystone's use of Jaccard's mark falls within its role as a distributor, the details of which have not been provided.  In short, this Court finds that there exist disputed issues of material fact as to Keystone's use of Jaccard's word mark and whether that use constitutes nominative fair use under the Lanham Act.  Summary judgment on Jaccard's first counterclaim will therefore be denied.  See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 609 (9th Cir. 2005) (issues of fact regarding fair use defense precluded summary judgment).

### 3.    Unfair Competition under New York State Law.

Jaccard asserts a counterclaim against Keystone for unfair competition under New York law based on Keystone's alleged infringement of Jaccard's trade dress and trademark rights.   Under New York law, "the essence of unfair competition is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" Waddington, 2002 WL 2031372, at *10

---

[17]It is important to recognize that in the context of Jaccard's counterclaim for trade dress infringement discussed previously, the design of the Deni® product is at issue.  Therefore, whether Keystone had any control over the J.C. Penney or QVC incidents is immaterial to the issue of whether the product design itself is likely to cause confusion.  On this counterclaim, however, Jaccard is alleging that Keystone affirmatively used its JACCARD mark in an infringing manner to intentionally create confusion, apparently in connection with the sale of both the JACCARD® and Deni® meat tenderizers.  Jaccard will therefore have to produce evidence of Keystone's actions.

(quoting Forschner Group, Inc. v. Arrow Trading Co., Inc., 124 F.3d 402, 408 (2d Cir. 1997)).  Unfair competition under New York law is similar to unfair competition under the Lanham Act.  See Gleason Works v. Oerlikon Geartec, AG, 141 F.Supp.2d 334, 337 (W.D.N.Y. 2001).  For the reasons discussed above in the context of Jaccard's Lanham Act claims, this Court finds that summary judgment on Jaccard's state law unfair competition claim must also be denied.

**D.     Defendants' Motion for Partial Summary Judgment on Plaintiff's Claims**

Jaccard has moved for summary judgment on Keystone's first, second and fifth causes of action.  Keystone's first cause of action alleges false marking in violation of 35 U.S.C. § 292.  Its second cause of action alleges a violation of the Lanham Act, 15 U.S.C. § 1125(a).  Keystone's fifth cause of action alleges that Jaccard has engaged in unfair competition in violation of New York law.  Jaccard also moves for dismissal of this action against Eric Wangler.

Each of these causes of action revolves around the same nucleus of facts. Keystone contends that after expiration of their U.S. patents, Defendants made representations to Keystone's customers, potential customers and sales representatives that their hand-held meat tenderizer was patented, as if to imply that the goods were covered by unexpired patents.  In addition, Keystone contends that Jaccard misrepresented that other patents were pending in the United States on Jaccard's hand-held meat tenderizers, which was not true.

In support of these allegations, Keystone submits two identical letters dated February 27, 2003, in which Mr. Wangler advises Chef's Catalog and Sur la Table that its meat tenderizers are patented. (Sommer Decl., Exhibits G and H.)  Mr. Wangler admits

writing these letters, but states that he believed that Jaccard's meat tenderizer was covered by one or more unexpired patents, including U.S. and foreign patents.[18] (Wangler Decl., ¶ 46.) Further, Keystone points to a letter written by Mr. Wangler in 2003 in which he refers to "the patented JACCARD® meat tenderizer" and states that "Jaccard Corporation provides a patented product." (Sommer Decl., Exhibit F.) Keystone contends that this letter was written after the U.S. patents had expired.

Moreover, Keystone also relies on the affidavit of Julia Austein, who is a buyer for Chef's Catalog. (Sommer Decl., Exhibit I.) Ms. Austein testified that in May of 2003, Mr. Wangler advised her that the Jaccard meat tenderizer was patented. (Sommer Decl., Exhibit I.) Mr. Wangler admits to having this telephone conversation with Ms. Austein, but denies that he represented that Jaccard's meat tenderizers were patented. (Wangler Decl., ¶ 47.) Rather, he maintains that he "stated [his] *belief*" that the meat tenderizer was patented. (Wangler Decl., ¶ 47 (emphasis added).)

Keystone also relies on the undisputed fact that the JACCARD® meat tenderizer and its packaging were improperly marked with "Pat.P" after the product had already been patented for many years. (Sommer Decl., Exhibit N.) Defendants maintain that they were unaware of this unintentional error, and took immediate steps to correct the mistake when it was discovered in the Spring of 2003. (Wangler Decl., ¶ 49.) Mr. Wangler maintains that he had the product mold changed to delete the "Pat.P." reference and that he had stickers printed and applied to the packaging of the product to eliminate the reference on the package. (Wangler Decl., ¶ 49.)

---

[18]It appears from the record that Jaccard's last U.S. patent expired on April 4, 2003. (Complaint, ¶ 19; Answer, ¶ 5.)

Finally, Keystone has submitted evidence that Jaccard attempted to disparage its Deni® meat tenderizer.  In a letter dated August 27, 2003, from Mr. Wangler to Cabelas Catalog, he advises, among other things, that "Deni's pricing is lower than Jaccard's due to the fact that they are providing a <u>much lower quality product</u>."  (Sommer Decl., Exhibit L (emphasis in original).)  Mr. Wangler also comments and attaches a chart purportedly demonstrating that the hardness and sharpness of the Deni® blades were insufficient for a mechanical meat tenderizer.  (Sommer Decl., Exhibit L.)  Keystone commissioned its own testing of the products and has submitted a report from Acts Testing Laboratory that concludes that the two products have similarly hard and sharp blades.  (Sommer Decl., Exhibit M.)  Jaccard contests this evidence.

## 1.    False Marking under 35 U.S.C. § 292

A $500 per offense fine is imposed under 35 U.S.C. § 292 upon, *inter alia*, "[w]hoever marks upon, or affixes to, or uses in advertising in connection with any article, the words "patent applied for," "patent pending," or any word importing that an application for patent has been made, when no application for patent has been made, or if made, is not pending, for the purpose of deceiving the public."  35 U.S.C. § 292(a).  It imposes the same monetary fine on

> "[w]hoever, without the consent of the patentee, marks upon, or affixes to, or uses in advertising in connection with anything made, used, offered for sale, or sold by such person within the United States, or imported by the person into the United States, the name or any imitation of the name of the patentee, the patent number, or the words "patent," "patentee," or the like, with the intent of counterfeiting or imitating the mark of the patentee, or of deceiving the public and inducing them to believe that the thing was made, offered for sale, sold, or imported into the United States by or with the consent of the patentee."

35

Id.

This statute is penal in nature, and must therefore be strictly construed. KOR-CT, LLC v. Savvier, Inc., 344 F.Supp.2d 847 (D.Conn. 2004); Blank v. Pollack, 916 F.Supp. 165, 173 (N.D.N.Y. 1996). "The statute requires intent to deceive, but, an intent to deceive the public will not be inferred if the facts show no more than that the erroneous patent marking was the result of mistake or inadvertence." Blank, 916 F.Supp. at 173 (citing Johnston v. Textron, 579 F.Supp. 783, 795 (D.R.I. 1984)).

It is uncontested in this case that the JACCARD® meat tenderizer and its attendant packaging was mismarked with the "Pat.P." designation. That is, no patent, foreign or domestic, was pending for the JACCARD® tenderizer. The question is whether Jaccard mismarked its product and packaging with the intention of deceiving the public into believing that patents were pending for its product, or whether, as it claims, the mismarking was merely a mistake. This Court finds that resolution of Jaccard's intent is a question best left for the jury. A reasonable jury, viewing the facts presented herein and the relationship between Keystone and Jaccard in totality, could find that Jaccard's mismarking of its product and advertising for many years was intentional. Equally plausible is a finding by a jury that Jaccard's mismarking occurred as the result of a mistake, with no intention to deceive. Accordingly, Jaccard's request for summary judgment on this claim will be denied. See Blank, 916 F.Supp. at 173 (denying summary judgment and leaving question of intent to deceive to jury).

As for the alleged oral and written statements made by Mr. Wangler to Chef's Catalog, Sur la Table and Julia Austein, Defendants argue, among other things, that they

36

are not liable under § 292 because at the time the alleged statements were made, the JACCARD® was protected by the '476 patent and various foreign patents.  Thus, any statement that the product was patented was true.  Construing the statute strictly as it must, this Court finds Defendants' argument to be persuasive under <u>Savvier</u>.

    <u>Savvier</u> involved allegations that the defendant had marked its product as patented when in fact, no U.S. patent had been granted.  344 F.Supp.2d at 857.  However, at the time of the alleged mismarking, defendant's product was protected by five foreign patents. In examining the statute, the court noted that § 292 does not distinguish between foreign and domestic patents.  Construing the statute strictly, the court concluded that § 292 "only prohibits the marking of articles that are not subject to either foreign or domestic patent protection."  <u>Id.</u> (citing <u>Noma Lites Canada, Ltd. v. Westinghouse Electric Corp.</u>, 399 F.Supp. 243, 254 (D.D.C. 1975).

    This Court agrees with the analysis set forth in <u>Savvier</u>.  Section 292 does not differentiate between U.S. and foreign patents.  Even assuming that the '476 patent was expired at the time that these acts are alleged to have occurred, it is uncontested that Jaccard's product was covered and continues to be covered by foreign patents. Accordingly, this Court finds that no action under § 292 can be maintained against Jaccard for its oral and written representations.  Summary judgment on this issue will therefore be granted in Jaccard's favor.[19]

---

[19]This Court also notes that there is insufficient evidence from which a jury could find that Mr. Wangler's statements were used in advertising as § 292 requires.  <u>See</u> <u>Symbol Techs., Inc. v. Proxim Inc.</u>, No.Civ.A. 01-801, 2002 WL 1459476, at *1 (D.Del. 2002) (finding that the term "uses in advertising" cannot refer to any and all documents in which the word "patent" is brought to the attention of the public; to give the statutory term meaning it must apply only to advertisements designed to promote a product). This is an alternative basis for granting summary judgment in Jaccard's favor.

### 2.    False Marking under the Lanham Act

Keystone alleges Jaccard violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). In essence, Keystone argues that Jaccard's alleged acts of false marking and false representation violate the Lanham Act because they constitute misrepresentations of the nature of Jaccard's product and are misleading descriptions of fact.  15 U.S.C. § 1125(a).

This Court finds that genuine issues of material fact exist regarding whether Jaccard's actions violate the Lanham Act.  The operative facts are clearly in dispute.  A reasonable jury could view the evidence of Jaccard's mismarking of its product, the oral and written statements made by Mr. Wangler to Chef's Catalog, Sur la Table and Julia Austein, and the allegedly false disparaging remarks about the quality of the Deni® tenderizer, and conclude that Jaccard's actions were intentionally taken and designed to create customer confusion or mislead customers.[20]   A reasonable jury could also view the evidence and find that no violation of the Lanham Act occurred.  Consequently, Jaccard's request for summary judgment on this claim will be denied.

### 3.    Unfair Competition under New York Law

For the reasons already stated, this Court also finds that Jaccard's request for summary judgment on Keystone's unfair competition claim, which is analytically the same as the Lanham Act claim, must be denied.

---

[20]To be clear, this Court's ruling on Keystone's § 292 claim does not bar consideration of Mr. Wangler's oral and written statements for purposes of the Lanham Act claim.  This is because this Court's ruling under § 292 is based on statutory construction, which obviously does not apply to consideration of the Lanham Act claim.

### 4.    Dismissal of Eric Wangler

Jaccard argues that Mr. Wangler should be dismissed from this case because he did not act in his individual capacity as to any of the acts alleged by Keystone, but rather, acted in his capacity as an officer of Jaccard Corporation.   Keystone argues that Mr. Wangler should remain in this action because he is the president and sole stockholder in Jaccard Corporation and is personally responsible for many of that acts complained of in the Complaint.

Corporate officers may be held personally liable for tortious acts committed in connection with their corporate duties.  See Instuform Techs., Inc. v. Cat Contracting, Inc., 385 F.3d 1360, 1373 (Fed. Cir. 2004).  Here, given the numerous unresolved issues of material fact, this Court finds that the evidence weighs in favor of keeping Mr. Wangler in the case since he is repeatedly personally named in the actions of which Keystone complains.   He is also, moreover, the president and sole stockholder of Jaccard Corporation.

### E.    Defendants' Motion to Disqualify Plaintiff's Expert Witness

Defendants seek the disqualification of Keystone's Expert Witness, Leonard A. Deni pursuant to Rule 37 of the Federal Rules of Civil Procedure.  In addition, Defendants seek preclusion of Mr. Deni's expert report on the grounds that he did not personally prepare it. Keystone opposes this motion.

Leonard A. Deni is the Vice-President and 40% shareholder of Keystone.  (Falkides Decl.,[21] ¶ 5; Deni Decl.,[22] ¶ 1.)  He has been named as Keystone's expert witness on trade dress and has prepared an expert report dated June 30, 2004.[23]  (Falkides Decl., ¶ 6; Deni Decl., ¶¶ 1, 2.)  Mr. Deni signed the report and stated at his deposition that he was the author of the report.  (Falkides Decl., ¶ 7.)  During other portions of his deposition, however, Mr. Deni admitted that he did not prepare the report himself.  (Falkides Decl., ¶ 11.)  Rather, Mr. Deni testified that he discussed his report with someone who then prepared the report for him.  (Falkides Decl., ¶ 11.)  Mr. Deni further testified at his deposition that he had little understanding of the legal standards upon which trade dress is evaluated.  (Falkides Decl., ¶ 15.)

Rule 37, which concerns the discovery obligations of civil litigants, vests district courts with "broad power" and discretion to impose sanctions, including dismissal, on parties who fail to adhere to discovery orders and rules.  See Friends of Animals, Inc. v. United States Surgical Corp., 131 F.3d 332, 334 (2d Cir. 1997) (per curiam); see also Jones v. J.C. Penney's Dep't Stores, Inc., 228 F.R.D. 190, 195 (W.D.N.Y. 2005); JSC Foreign Econ. Ass'n. Technostroyexport v. Int'l Dev. & Trade Servs., Inc., No. 03 Civ. 5562, 2005 WL 1958361, at *9 (S.D.N.Y. Aug. 16, 2005).

---

[21]Referring to the Declaration of A. Nicholas Falkides filed in support of Defendants' Motion to Disqualify Plaintiff's Expert Witness.

[22]Referring to the Declaration of Leonard A. Deni filed in opposition to Defendants' Motion to Disqualify Plaintiff's Expert Witness.

[23]A copy of Mr. Deni's expert report is attached to the Declaration of Leonard A. Deni filed in opposition to Defendant's Motion to Disqualify Plaintiff's Expert Witness.

Rule 26(a)(2) of the Federal Rules of Civil Procedure governs the disclosure of expert testimony. Pursuant to Rule 26(a)(2)(B), expert witness disclosure must be accompanied by "a written report prepared and signed by the witness." See W.R. Grace & Co.-Conn v. Zotos Int'l, Inc., 98-CV-838S, 2000 WL 1843258, at *3 (W.D.N.Y. Nov. 2, 2000). The 1993 Advisory Committee Notes to Rule 26(a)(2)(B) provide as follows:

> Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness.

(Emphasis added.)

Accordingly, attorneys are not precluded from assisting expert witnesses in the preparation of their reports so long as the witness remains substantially involved. See Isom v. Howmedica, Inc., 2002 WL 1052030 (N.D. Ill. 2002) (finding that expert report drafted by attorney after extensive discussions with expert witness satisfied Rule 26(a)(2)(B)); Manning v. Crockett, 95 C 3117, 1999 WL 342715, at *3 (N.D.Ill. May 18, 1999) ("some attorney involvement in the preparation of an expert report is permissible, but . . . the expert must also substantially participate in the preparation of his report").

In his sworn opposing declaration, Mr. Deni admits that he prepared his expert report with the assistance of Keystone's counsel. (Deni Decl., ¶ 2.) However, he further states that he was actively and substantively involved in the preparation and content of his report, and that he thoroughly read it prior to affixing his signature. (Deni Decl., ¶¶ 2,3.) Moreover, he ratified and confirmed that the opinions set forth in the report are his own expert opinions. (Deni Decl., ¶ 4.)

41

In light of this sworn declaration, this Court finds that disqualification of Mr. Deni and preclusion of his expert report is not warranted. First, Mr. Deni has sworn that he was substantially involved in the preparation of his expert report and that the opinions contained therein are his. Second, there is no persuasive evidence that Mr. Deni was *not* substantially involved in preparing the report. That is, while Defendants argue that Mr. Deni's deposition testimony suggests that he was less than substantially involved in the preparation of the report, there is no real evidence to this effect. Finally, Defendants' arguments that Mr. Deni is an interested witness, that he has an inadequate knowledge of the governing legal standards, and that he did not prepare his expert report on his own may be raised on cross-examination at trial on the issues of Mr. Deni's bias and credibility, and the appropriate weight, if any, to be afforded his expert testimony. Accordingly, Defendants' motion will be denied.

## IV. CONCLUSION

For the reasons stated above, the parties' motions are granted in part and denied in part consistent with this Decision and Order.

## V. ORDERS

IT HEREBY IS ORDERED, that Plaintiff's Motion for Partial Summary Judgment (Docket No. 17) is DENIED.

FURTHER, that Defendants' Motion for Partial Summary Judgment on Certain of its Counterclaims (Docket No. 30) is DENIED.

FURTHER, that Defendants' Motion for Partial Summary Judgment on Certain of Plaintiff's Causes of Action (Docket No. 29) is GRANTED in part and DENIED in part

consistent with this Decision and Order.

FURTHER, Defendants' Motion to Preclude Plaintiff's Expert Witness (Docket No. 48) is DENIED.

SO ORDERED.

Dated:      September 27, 2005
            Buffalo, New York

                                    /s/William M. Skretny
                                  WILLIAM M. SKRETNY
                                United States District Judge