UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KEYSTONE MANUFACTURING CO., INC.,

Plaintiff,

v.

JACCARD CORP. and ERIC J. WANGLER,

Defendants.

**DECISION AND ORDER**
03-CV-648S

## I. INTRODUCTION

Presently before this Court is Plaintiff Keystone Manufacturing Co., Inc.'s Motion to Construe Defendant Jaccard Corp.'s expired U.S. utility Pat. No. 4,463,476 ("the '476 patent").[1]  Also before this Court is Jaccard's request to construe its expired U.S. design Pat. No. D-276,685 ("the '685 patent").[2]  At issue is the evidentiary value of these two patents as it relates to Jaccard's trade dress infringement counterclaim.  These motions are precipitated by this Court's previous decision on the parties' cross-motions for summary judgment.  See Keystone Mfg. Co., Inc. v. Jaccard Corp., 394 F.Supp.2d 543 (W.D.N.Y. 2005).  Familiarity with that decision is presumed.

## II. BACKGROUND

Among other rulings in its prior decision, this Court denied Jaccard's request for summary judgment on its counterclaim for trade dress infringement under § 43(a) of the

---

[1] In support of this motion, Plaintiff filed a memorandum of law, the Declaration of Peter K. Sommer, Esq., with attached exhibits, and a reply memorandum of law.  Defendants filed a memorandum of law, the Declaration of Jeffrey F. Reina, Esq., with attached exhibits, an Errata to the memorandum of law, and a reply memorandum of law.

[2] Jaccard asserted this request in its memorandum of law.

Lanham Act, 15 U.S.C. § 1125(a).  See id. at 552-562.  In doing so, this Court found that

summary judgment was precluded because of the existence of disputed issues of material

fact, and because Markman[3] claim construction proceedings were necessary to determine

the proper evidentiary value, if any, of the '476 patent under the framework set forth in

TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164

(2001).  See Keystone, 394 F.Supp.2d at 562.

In TrafFix, the United States Supreme Court held that the existence of a prior utility

patent claiming the features alleged to be protected trade dress constitutes strong

evidence of functionality.  TrafFix, 532 U.S. at 29.

> A prior patent, we conclude has vital significance in resolving
> the trade dress claim.  A utility patent is strong evidence that
> the features therein claimed are functional.  If trade dress
> protection is sought for those features the strong evidence of
> functionality based on the previous patent adds great weight to
> the statutory presumption that features are deemed functional
> until proven otherwise by the party seeking trade dress
> protection.  Where the expired patent claimed the features in
> question, one who seeks to establish trade dress protection
> must carry the heavy burden of showing that the feature is not
> functional, for instance by showing that it is merely an
> ornamental, incidental, or arbitrary aspect of the device.

Id. at 29-30.

Jaccard maintains that the design of its JACCARD® meat tenderizer is protected

trade dress, and that Keystone has violated its intellectual property rights by selling the

Deni® tenderizer.  To succeed on this claim, Jaccard must establish that (1) its trade dress

is distinctive as to the source of the product, (2) Keystone's product dress creates a

likelihood of customer confusion, and (3) its trade dress is not functional.  See Landscape

---

[3]Markman v. Westview Instruments, 52 F.3d 967 (Fed. Cir. 1995) (en banc).

Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 377 (2d Cir. 1997); Fibermark, Inc.

v. Brownville Specialty Paper Prods., Inc., No. 7:02-CV-0517, 2005 WL 1173562, at *3

(N.D.N.Y. May 11, 2005); 15 U.S.C. § 1125(a).

This Court resolved the first two elements in its prior decision.  As to distinctiveness,

which is a question of fact, this Court found that based on the evidence presented,

particularly the expert witness reports, genuine issues of material fact exist concerning

whether Jaccard's trade dress has developed "secondary meaning."  See Keystone, 394

F.Supp.2d at 554-557; Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 211, 120

S.Ct. 1339, 1342, 146 L.Ed.2d 182 (2000) (trade dress is distinctive if it acquires

"secondary meaning").

Similarly, on the second element, which also involves a question of fact, this Court

canvassed the relevant Polaroid factors[4] and determined that the record contained

conflicting evidence on the ultimate issue of whether there is a likelihood of confusion

between the JACCARD® and Deni® meat tenderizers.  See Keystone, 394 F.Supp.2d at

557-560.

The third element – whether the JACCARD® meat tenderizer's trade dress is non-

functional – is the element that requires the instant claim construction proceedings.  This

Court previously recognized that functionality is a question of fact, and found that the

competing expert opinions in the record raise disputed issues that must be resolved by the

jury.  Id. at 562.  However, this Court further recognized that claim construction is an issue

---

[4]The eight Polaroid factors are as follows: (1) the strength of the mark, (2) the degree of similarity
between the two marks, (3) the proximity of the products, (4) the likelihood that the prior owner will bridge
the gap, (5) actual confusion, (6) the defendant's good faith in adopting its own mark, (7) the quality of
defendant's product and (8) the sophistication of the buyers.  Polaroid Corp. v. Polarad Elecs. Corp., 287
F.2d 492, 495 (2d Cir. 1961).

of law, and found that because of the possible evidentiary nature of Jaccard's '476 patent

under TrafFix, further Markman proceedings would be required in advance of trial.  Id.

As a result, Keystone filed a Motion to Construe the '476 utility patent, which it

asserts claims the very features that Jaccard now maintains are protected as trade dress.

Jaccard opposes this motion, and also requests that this Court construe its expired '685

design patent, which it argues raises a presumption of non-functionality.  An examination

of both patents is therefore necessary to determine their evidentiary value, if any.  This

Court turns to that task now.

## III. DISCUSSION

### A.    Keystone's Motion to Construe the '476 Utility Patent

Before engaging in claim construction relative to the '476 utility patent, a threshold

issue must be addressed.  In TrafFix, the Court stated that "*[w]here the expired patent*

*claimed the features in question*, one who seeks to establish trade dress protection must

carry the heavy burden of showing that the feature is not functional."  532 U.S. at 30

(emphasis added).  Implicit in this statement is the notion that the relevant prior patent (or

patents) is the one covering the product for which trade dress protection is asserted.  Here,

there appears to be disagreement between the parties as to which prior utility patent

covers the meat tenderizers at issue.

To this point, the parties and this Court have labored under the assumption that the

relevant prior patent is the '476 patent.  See, e.g. Keystone, 394 F.Supp.2d at 560-62

(noting that "[b]oth sides have focused on whether Jaccard's trade dress is claimed in

Claim 15 of the '476 patent").  In fact, the thrust of Keystone's argument has consistently

been that all elements of Jaccard's alleged trade dress are disclosed in the '476 utility

patent, and are incorporated into Claim 15 of that patent by use of the "blade cover means"

and "handle means" terms.  Jaccard, however, now persuasively demonstrates that the

meat tenderizers at issue are *not* of the variety disclosed in the '476 patent.  Rather, they

practice the '841 patent, which does not include the "means" terms present in Claim 15 of

the '476 patent.

Patent construction principles are well settled, and were recently summarized by the

Federal Circuit as follows:

> Ascertaining the meaning of the claims requires that they be
> viewed in the context of "those sources available to the public
> that show what a person of skill in the art would have
> understood disputed claim language to mean." *Phillips v. AWH
> Corp.,* 415 F.3d 1303, 1314 (Fed.Cir. 2005) (en banc) (quoting
> *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
> 381 F.3d 1111 (Fed.Cir. 2004)). *Phillips* teaches that different
> weights are to be placed on these sources. The most relevant
> source is the patent's specification, which is "the single best
> guide to the meaning of a disputed term." *Id.* at 1315 (quoting
> *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582
> (Fed.Cir. 1996)). Next in importance is the prosecution history,
> which is also part of the "intrinsic evidence" that directly reflects
> how the patentee has characterized the invention. *Id.* at 1317.
> Extrinsic evidence-testimony, dictionaries, learned treatises, or
> other material not part of the public record associated with the
> patent-may be helpful but is "less significant than the intrinsic
> record in determining the legally operative meaning of claim
> language." *Id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.,*
> 388 F.3d 858, 862 (Fed.Cir. 2004)). The words of patent
> claims have the meaning and scope with which they are used
> in the specification and the prosecution history. *Multiform
> Desiccants, Inc. v. Medzam,* 133 F.3d 1473, 1478 (Fed.Cir. 1998).

MBO Labs., Inc. v. Becton, Dickinson & Co., No. 2006-1062, 2007 WL 163068, at *4 (Fed.

Cir. Jan. 24, 2007).

In relevant part, the '476 patent discloses an improvement of the '841 patent through the addition of channels and holes in the handle to facilitate lubrication and drainage when being washed. (Sommer Aff., Exhibit C, Column 3: 10-12 ("This invention therefore provides an improved construction for the tenderizer of [the '841 patent] that enhances its cleanability and operability.").) For example, the '476 patent includes a lengthy discussion of the disadvantages of existing hand-held mechanical meat tenderizers, particularly as they relate to the inability to thoroughly clean the device after use. (Sommer Aff., Exhibit C, Column 1: 40-68.) The stated objective of the '476 patent is to eliminate these disadvantages and provide a more sanitary meat tenderizer. (Sommer Aff., Exhibit C, Column 2: 3-12.)

Moreover, in the "Summary of the Invention" portion of the '476 patent, the improvement is partially described as follows:

> Extending from the interior of said housing or housings and the exterior of the handle is an aperture or apertures that will permit draining out of the water or liquid containing debris. The tenderizer can then after cleaning and draining be rinsed and thoroughly cleaned both in its exterior and interior portions. It is preferred that the apertures extend through both the upper and lower portions of the handle or housing to permit easier flow of the liquid to be drained from the cavities or hollow portions.
>
> . . .
>
> The important aspect of the invention is that the apertures or channels extend from the interior hollow portion of the housing to the outer portion of the housing, be both above and below the hollow portion. This will facilitate the easy flow of liquids out of the interior of the housing.

(Sommer Aff., Exhibit C, Column 2: 42-51, Column 3:36-41.)

Keystone concedes that the disclosed embodiment in the '476 patent depicts the

referenced drainage holes, but it contends (without elaboration) that Claim 15 does not

specifically require them.  (Keystone Reply Memorandum, pp. 15-16.)  This argument,

however, is belied by not only the statements set forth above, but also by the text of the

claims and Keystone's own characterization of the '476 patent.

> Claims 1 and 15 of the '476 patent recite the drainage mechanism as follows:

>> said handle means comprising an external and an internal
>> open liquid flow channel network adapted to permit liquid to
>> drain from all internal hollow handle means cavities out of said
>> handle means . . ."

(Sommer Aff., Exhibit C, Column 5: 18-21, Column 6: 25-29.)

> Claim 9 similarly describes the drainage mechanism as

>> said handle means comprising a drain network adapted to
>> permit internally accumulated fluids to drain out of said handle
>> means, said drain network comprising at least one internal
>> cavity within said handle means in liquid flow contact with any
>> other internal cavities, at least one of said cavities having
>> means therein to permit flow out of said handle means . . .

(Sommer Aff., Exhibit C, Column 5: 51- Column 6:5.)

Thus, the claims of the '476 patent require the drainage network mechanism,

including open drainage holes or other apertures to facilitate the flow of liquid out of the

handle.

This conclusion is consistent with Keystone's own understanding of the '476 patent.

Keystone has described the '476 patent in its papers as follows:

- The '476 patent is an express improvement of the earlier '841 patent.  The devices shown in these two patents are structurally and functionally similar, and operate in substantially the same way.  The salient difference is that the handle of the '476 patent has an open interior construction and has certain openings that facilitate lubrication and drainage when being washed. (Keystone Memorandum of Law, p. 2 (emphasis in original).)

- . . . in claim 15 of the '476 patent, the patentee . . . was explicit and specific about the "open channel network" which facilitated drainage . . . (Keystone Memorandum of Law, pp. 2-3.)

- . . . the specifically-improved feature of the '476 patent related to the open construction and drainage of the handle . . . (Keystone Memorandum of Law, pp. 4-5.)

- The '476 patent discloses the improved form (*i.e.*, with the open internal handle configuration to facilitate lubrication and drainage) . . . (Keystone Memorandum of Law, p. 5.)

- Jaccard's '841 <u>utility</u> patent is directed toward a hand-held meat tenderizer including a combination of elements (*e.g.*, a handle, a blade segment assembly, a stripping plate, etc.). Jaccard's '476 <u>utility</u> patent is directed to a improved hand-held meat tenderizer wherein the handle further includes an open channel network to facilitate liquid drainage. (Keystone Reply Memorandum of Law, p. 6 (emphasis in original).)

- . . . the "open channel network" that facilitated liquid drainage from within the handle was new [in the '476 patent], and could sustain patentability. In fact, in the Notice of Allowability, the Examiner expressly stated that the "claims [in the '476 patent were] allowed on the basis of the drain network in [the] handle. (Keystone Reply Memorandum of Law, p. 11 (first and second alterations added).)

Accordingly, this Court finds that the '476 patent, through its claims, specification and prosecution history,[5] requires the drainage holes and mechanism described therein. Indeed, it appears that the only difference between the '841 patent and the '476 patent is the '476 patent's inclusion and requirement of the drainage system. Despite its statement to the contrary, this construction is consistent with Keystone's own repeated characterization of the '476 patent.

Having construed the '476 patent as requiring the holes and drainage system, this Court now looks to the commercial products at issue to determine whether they practice

---

[5]The prosecution history of the '476 patent is provided as Exhibit E to the Sommer Affidavit.

the '476 patent.  Counsel provided samples of both the JACCARD® and the Deni® meat

tenderizers when they appeared before this Court on September 13, 2006.  (See Docket

No. 73.)  An examination of each sample reveals beyond dispute that neither contains the

required drainage components of the '476 patent.  Most prominently, there are no holes

that would "permit draining out of the water or liquid containing debris" as required by the

'476 patent.  (Sommer Aff., Exhibit C, Column 2: 42-51, Column 5: 18-21, Column 6: 25-

29, Column 5: 51 - Column 6:5.)  The lack of the drainage system coupled with Jaccard's

unrebutted representation that it never produced a product practicing the '476 patent leads

this Court to the conclusion that the '476 patent does not cover the meat tenderizers at

issue.  (Jaccard Memorandum of Law, p. 10 (representing that Jaccard's meat tenderizer

produced under the '841 patent was "never changed to include the drainage channels and

holes of the '476 patent").)

Since the meat tenderizers do not practice the '476 patent, the expired '476 utility

patent is not entitled to the evidentiary value discussed in TrafFix.  While TrafFix does not

explicitly limit the evidentiary value of expired utility patents to those patents practiced by

the product, this Court is confident that this result is what the Court intended.  In portions

of the decision, the Court speaks in general terms.  For example, it defines the principal

question before it as "the effect of *an* expired patent on a claim of trade dress

infringement."  TrafFix, 532 U.S. at 29 (emphasis added).  It goes on to hold that "*a* utility

patent" is strong evidence of functionality.  Id. (emphasis added).

Taken in its totality, however, this Court finds that the most accurate and reasonable

reading of TrafFix is that the existence of a prior utility patent (or patents) *that covered the*

*products in question* would be the relevant patent (or patents) for evidentiary purposes on

a trade dress claim.  For example, the dual-spring road sign design at issue in TrafFix practiced the two expired utility patents at issue.  See TrafFix, 532 U.S. at 25 ("the holder of the now-expired . . . patents established a successful business in the manufacture and sale of sign stands incorporating the patented feature") and at 30 ("the central advance claimed in the expired utility patents . . . is the dual-spring design"). Thus, the underlying factual basis for the Court's decision in TrafFix involved prior utility patents that covered the product for which trade dress protection was asserted.

Moreover, the Court noted that "[w]here *the expired patent claimed the features in question*, one who seeks to establish trade dress protection must carry [a] heavy burden." Id. at 30 (emphasis added).   It therefore ruled that the respondent could not establish trade dress protection specifically because it could not overcome "the strong evidentiary inference of functionality *based on the disclosure of the dual-spring design in the claims of the expired patents.*"  Id. at 30 (emphasis added).  If the patent at issue "claimed the features in question," then the Court must be referring to a prior patent that is practiced by the product.  See also id. at 30 ("A utility patent is strong evidence *that the features therein claimed* are functional.").

As such, this Court concludes that under TrafFix, only a prior utility patent (or patents) that is practiced by the product at issue is evidence of functionality for trade dress purposes.  Otherwise, the direct connection between the expired patent and the claimed trade dress design that was critical in TrafFix is absent.  Therefore, this Court finds that because the '476 patent is not practiced by the meat tenderizers at issue, it cannot carry

the evidentiary weight discussed in TrafFix.[6]  Rather, it appears that the relevant prior

patent is the '841 utility patent, and no argument is presented to this Court that the design

features of the JACCARD® meat tenderizer that Jaccard now identifies as protected trade

dress were claimed in the '841 utility patent.

**B.    Jaccard's Request to Construe the '685 Design Patent**

Jaccard requests that this Court construe its '685 design patent and find that (1) the

patent covers the design of the JACCARD® meat tenderizer at issue, and (2) the existence

of the patent gives rise to a legal presumption that the design is non-functional.  Keystone

does not challenge Jaccard's proposed construction of the '685 patent or its assertion that

the '685 patent covers the JACCARD® meat tenderizer at issue.[7]  However, it maintains

that a legal presumption of non-functionality does not arise from the existence of a design

patent.

"Whoever invents any new, original and ornamental design for an article of

manufacture may obtain a patent therefor." 35 U.S.C. § 171.  As such, a design patent is

directed to the appearance of an article of manufacture.  L.A. Gear, Inc. v. Thom McAn

Shoe Co., 988 F.2d 1117, 1123 (Fed.Cir. 1993).  The protection afforded by a design

patent, however, is narrow, covering only what is shown in the drawings in the patent.  In

re Mann, 861 F.2d 1581, 1582 (Fed. Cir. 1988).  "Protection is further limited to only the

novel ornamental features of the patented design."  OddzOn Prods. v. Just Toys, 122 F.3d

---

[6]In light of this finding, it is unnecessary for this Court to engage in claim construction of Claim 15
of the '476 patent.

[7]It appears that Keystone concedes that the '685 patent covers the design of the meat tenderizer
at issue.  (See, e.g., Keystone Reply Memorandum of Law, p. 6 ("Jaccard's '583 and '685 design patents
are directed to the overall shapes and appearances of the meat tenderizers shown and described in its
two utility patents.") (emphasis in original).)

1396, 1405 (Fed.Cir. 1997).  Courts look to the drawings in the patent, not just one feature

of the claimed design, when defining the patented design.  See Amini Innovation Corp. v.

Anthony Ca., Inc., 439 F.3d 1365, 1370-71 (Fed. Cir. 2006).  Construction of a design

patent is a matter of law.  Markman, 52 F.3d at 970-71.

As noted, there is no expressed opposition to Jaccard's proposed construction of

the '685 patent, and this Court's review of the patent drawings confirms the correctness of

Jaccard's interpretation.  (Jaccard Memorandum of Law, p. 8.)  This Court therefore finds

that the claim of the '685 patent, which recites "[t]he ornamented design for a hand

operated meat tenderizer, as shown and described," describes

> (1) a front elevation reflecting the external appearance of a
> hand operated meat tenderizer with all four corners being soft,
> a flat, horizontal top with inwardly directed side surfaces,
> descending into a portion of reduced width, then curving or
> angling out in the middle portion to achieve a greater width,
> then curving back in to finally reflect a generally rectangular
> bottom portion;
>
> (2) a right end elevational view showing similar dimensions as
> the front view and additionally reflecting that the front and back
> sides of the top portion taper inward, while the front and back
> sides of the bottom portion do not; and
>
> (3) a top, rear perspective view, also showing the left end,
> which nearly mirrors the front elevation, with the exception of
> three screws shown on the upper portion of the design.

(Sommer Aff., Exhibit B.)

Further, this Court finds that the JACCARD® meat tenderizer at issue practices the

design of the '685 patent.[8]

As to Jaccard's assertion that the '685 design patent raises a presumption of non-

---

[8]The two meat tenderizers at issue in this case are depicted in Addendum A to this decision.

functionality, this Court is not persuaded.  Jaccard argues that several cases support its

position.  First, it relies on In Re Morton-Norwich Prods. Inc., in which the court suggested

that a design patent "at least presumptively," indicates that the design is not *de jure*

functional.  671 F.2d 1332, 1342, n. 2 (C.C.P.A. 1982) (citations omitted).  The question

of whether a legal presumption of non-functionality arises from the existence of a design

patent, however, was not before the court.  The court's comments, which were relegated

to a footnote, are therefore dicta.  Nonetheless, courts have relied on this comment.

In Krueger Int'l, Inc. v. Nightingale, Inc., a case on which Jaccard heavily relies, then

district judge Sotomayor relied in part on Morton-Norwich in stating the following:

> A design patent, therefore, can neither guarantee nor preclude
> a finding of protectable trade dress.
>
> The existence of a design patent, however, is relevant to the
> functionality defense. Because a design patent is granted only
> for non-functional designs, it can serve as evidence that a
> plaintiff's trade dress is not functional. *See, e.g., In re Morton-
> Norwich Prods., Inc.,* 671 F.2d 1332, 1342 n. 3 (C.C.P.A.1982)
> (design patent presumptively indicates that design is not *de
> jure* functional); *In re R.M. Smith, Inc.,* 734 F.2d 1482, 1485
> (Fed.Cir.1984) (existence of design patent "may be some
> evidence of non-functionality"). This is not tantamount to
> saying, however, that a design patent always serves as a
> trademark. *See, e.g., R.M. Smith,* 734 F.2d at 1485 (existence
> of design patent "does not, without more, bestow upon said
> device the aura of distinctiveness or recognition as a
> trademark") (citation omitted); *In re Vico Prods. Mfg. Co.,* 229
> U.S.P.Q. 364, 370 (T.T.A.B.1985) (quoting *R.M. Smith* ). At
> best, a design patent can only help rebut the functionality
> defense; it cannot do the whole job of proving inherent
> distinctiveness. The plaintiff still needs to show that, in its
> market at the time of the alleged infringement, the design is
> both ornamental and deserving of trade dress protection.

915 F.Supp. 595, 605 (S.D.N.Y. 1996), overruled on other grounds by, Landscape Forms,

Inc. v. Columbia Cascade Co., 113 F.3d 373 (2d Cir. 1997).  Jaccard seizes on Judge

Sotomayor's statement that "a design patent is only granted for non-functional designs" as

supportive of the presumption it endorses.  However, when Judge Sotomayor's discussion

is considered *in toto*, particularly as it relates to the evidentiary value of a design patent,

which is the issue at bar, it does not support Jaccard's position.

Judge Sotomayor states that the design patent "*is relevant* to the functionality

defense" and "*can serve as evidence* that a plaintiff's trade dress is not functional."  Id.

(emphasis added).  Along with citing Morton-Norwich, Judge Sotomayor cites In re R.M.

Smith, Inc._, decided two years after Morton-Norwich, in which the Federal Circuit

characterized a design patent as "some evidence of non-functionality." 734 F.2d 1482,

1485 (Fed.Cir.1984).  Nowhere in her discussion of the evidentiary value of a design patent

does Judge Sotomayor hold that it creates a presumption of non-functionality.  In this

Court's view, Jaccard's reading of Krueger is overbroad.[9]

Jaccard also relies on Topps Co., Inc. v. Verburg Co., another district court case in

which the court stated that "the expiration of the design patent . . . is presumptive evidence

of non-functionality.  No. 96 Civ. 7302, 1996 WL 719381, at *9 (S.D.N.Y. 1996).  As

support for this proposition, the court cites *McCarthy on Trademarks and Unfair*

*Competition*, § 6.03[5] as follows:

> In fact, a design patent, rather than detracting from a claim of
> trademark, may support such a claim.  Since a design patent
> is granted only for non-functional designs, it may be
> presumptive evidence of non-functionality and thus support the
> trademark claimant.

---

[9]In any event, Krueger is not binding authority, and for the reasons stated, this Court does not find
it persuasive on the issue-at-hand.

Id.

However, Professor McCarthy has since updated his position on the role of a design

patent in establishing non-functionality:

> A design patent, rather than detracting from a claim of non-functional trade dress or trademark, may support such a claim. Since a design patent is granted only for non-functional designs, it may be presumptive evidence of non-functionality and thus support the trademark claimant. *However, while a design patent is some evidence of non-functionality, alone it is not sufficient without other evidence.*

J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition 7:93 (4th ed.

2005) (emphasis added).  Professor McCarthy's footnote to the second sentence above

cites Morton-Norwich, but also cites the conflicting cases, such as In Re R.M. Smith.

Professor McCarthy's concluding sentence, however, is in this Court's view an

accurate recitation of the evidentiary relationship between a design patent and establishing

non-functionality: it is relevant evidence suggesting non-functionality.[10]  This Court agrees

with Keystone that Jaccard's assertion of a legal *presumption* of non-functionality

stemming from the existence of a design patent is not supported in the case law.  This

Court therefore declines to rule that such a presumption exists.[11]

## C.  Keystone's Interlocutory Appeal Request

Keystone requests that this Court facilitate an immediate appeal pursuant to 28

---

[10]Jaccard also relies on E-Z Bowz, LLC v. Prof. Prod. Research Co., where the court simply quoted Topps.  No. 00-Civ.-8670, 2003 WL 22068573, at *19 (S.D.N.Y. Sept. 5, 2003).  Since Topps is unpersuasive, E-Z Bowz is equally so.

[11]This Court notes that Jaccard opened its argument on this issue with the following sentence: "In a trade dress case where an accused infringer asserts that the trade dress is functional, the existence of a design patent claiming that trade dress is relevant."  (Jaccard Memorandum of Law, p. 4.)  In this Court's view, this is an accurate statement.

U.S.C. § 1292(b) of its prior ruling denying summary judgment on Keystone's third cause

of action.  See Keystone, 394 F.Supp.2d at 550.  A district judge may request that a Court

of Appeals hear an interlocutory appeal of an order not otherwise appealable if the district

judge finds in writing that the order involves a "controlling question of law as to which there

is substantial ground for difference of opinion" and finds that "an immediate appeal from

the order may materially advance the ultimate termination of the litigation."  28 U.S.C. §

1292(b).

Here, Keystone maintains that it has "an unqualified federal right to copy that which

is shown in an expired patent."  (Keystone Memorandum of Law, p. 6.)  In the context of

denying summary judgment on Keystone's third cause of action seeking a declaratory

judgment, this Court rejected this assertion, and found that

> the answer to whether Keystone can practice the teachings of
> the expired patents is clear:  Keystone may practice and copy
> the functional teachings of the expired patents, but only to the
> extent that its use does not infringe other intellectual property
> rights that Jaccard may possess or create customer confusion
> in violation of Jaccard's rights under the Lanham Act.  This is
> because the Lanham Act provides protection for trade dress
> only when it is non-functional.  See 15 U.S.C. § 1125(a)(3).  If
> aspects of the JACCARD® tenderizer design are determined
> to be non-functional and therefore entitled to intellectual
> property protection (e.g., trade dress), then Keystone cannot
> freely use and copy Jaccard's design.

Keystone, 394 F.Supp.2d at 550.  Keystone maintains that this Court's refusal to recognize

an *unqualified* right to copy that which is claimed in an expired patent is erroneous, and

that the issue should be immediately resolved by the Federal Circuit.  This Court is not

persuaded.

In this Court's view, the question presented is neither a "controlling question of law

as to which there is substantial ground for difference of opinion," nor would "an immediate appeal from the order . . . materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Keystone's own position appears to be substantially in line with this Court's prior ruling. Although Keystone advocates for recognition of an "unqualified" right to copy (Keystone Memorandum of Law, p. 6), it defines that right as "once a U.S. patent expires, whatever was claimed therein passes into the public domain and may be freely practiced by anyone, *so long has* [sic] *he does not pass his goods off as those of another*, (Keystone Memorandum of Law, p. 7). Thus, Keystone's own definition of the purportedly "unqualified right" is a *qualified* one, which is largely consistent with this Court's previous finding set out above. See Keystone, 394 F.Supp.2d at 550.

Moreover, Keystone's assertion of an unqualified right to copy is simply at odds with the governing authority. For example, if the right was indeed unqualified, as Keystone asserts, there would be no need for the Court's decision in TrafFix. What need would there be to determine the evidentiary weight of a prior utility patent on a subsequent trade dress claim if there is an unqualified right to copy, regardless of trade dress protection? There would be none.

Keystone's assertion that there is an unqualified right to copy that which was previously claimed in a patent stands in direct conflict with the Lanham Act and the Supreme Court's decision in TrafFix, which recognizes that a prior patent-holder, under certain circumstances, may receive trade dress protection for non-functional elements of a product previously covered by a patent. In this Court's view, an appeal on this issue is unlikely to succeed at this stage, and therefore facilitating such interlocutory review will not ultimately advance the termination of this litigation. Keystone's request for review pursuant

to 28 U.S.C. § 1292(b) will therefore be denied.

## IV. CONCLUSION

For the reasons stated above, this Court finds that (1) the '476 patent is not entitled to the evidentiary weight discussed in <u>TrafFix</u>, (2) the '685 patent is relevant evidence suggesting non-functionality, and (3) there is no cause to permit an interlocutory appeal of this Court's prior ruling on Keystone's request for declaratory judgment.

## V. ORDERS

IT HEREBY IS ORDERED, that Plaintiff's Motion to Construe (Docket No. 60) is GRANTED. The '476 and '685 patents are construed as set forth in the foregoing decision.

FURTHER, that Plaintiff's Request for Interlocutory Appeal is DENIED.

SO ORDERED.

Dated:      February 26, 2007
            Buffalo, New York


                          /s/William M. Skretny
                          WILLIAM M. SKRETNY
                          United States District Judge

**ADDENDUM A**

 

